**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| SANDY KEITH BASKINS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )     1:19CV839 |
| | ) |
| JOSH STEIN, Attorney General of | ) |
| North Carolina, et al. | ) |
| | ) |
| Respondents. | ) |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). (Docket Entry 1.) Respondent has moved for summary judgment (Docket Entries 4, 5), and Petitioner has responded in opposition (Docket Entry 7). For the reasons that follow, the Court should grant Respondent's Motion for Summary Judgment.

## I. Background

On July 13, 2015, a jury in the Superior Court of Guilford County found Petitioner not guilty of conspiracy to traffic in heroin, but guilty of trafficking heroin by possession of 28 grams or more and trafficking heroin by transportation of 28 grams or more in case 14 CRS 88608. (See Docket Entry 1, ¶¶ 1, 2, 4-6; see also Docket Entry 5-3 at 43; Docket Entry 5-18 at 448-49.)[1] The trial court consolidated the convictions and sentenced Petitioner

---

[1] Throughout this Recommendation, pin citations refer to the page numbers in the footer appended to those materials at the time of their docketing in the CM/ECF system. When quoting from the parties' filings, this Recommendation will use standard capitalization conventions.

to 225 to 289 months in prison.  (See Docket Entry 1, ¶ 3; see also Docket Entry 5-3 at 46-47; Docket Entry 5-18 at 460.)

Petitioner appealed to the North Carolina Court of Appeals, (see Docket Entry 1, ¶¶ 8, 9; see also Docket Entry 5-3 at 49-51; Docket Entry 5-18 at 460-61) and, in a published opinion, that court found no error in part and remanded in part for further findings regarding Petitioner's motion to suppress evidence seized during searches of the vehicle driven by Petitioner and its occupants, as well as any statements made by Petitioner during the stop (see Docket Entry 5-3 at 7-13), State v. Baskins (Baskins I), 247 N.C. App. 603 (2016).  Specifically, the court held that the record evidence did not support the trial court's findings of fact numbers 14 and 18 (see Docket Entry 5-3 at 15), because the vehicle driven by Petitioner remained in the 15-day grace period for registration renewal provided by N.C. Gen. Stat. § 20-66(g) at the time of the stop, Baskins I, 247 N.C. App. at 608, and because Detective M.P. O'Hal could not have determined that the vehicle's inspection status had expired, as the information he received on his in-vehicle computer from the North Carolina Division of Motor Vehicles ("DMV") in response to his license plate request did not include inspection data, id. at 608-09.[2]

Following remand but prior to issuance of the mandate from the Court of Appeals, the trial court entered an "Order on Remand, Still Denying Motion to Suppress" ("First Order on Remand").  (See

---

[2] The court also found the conclusions of law in the trial court's order inadequate.  See Baskins I, 247 N.C. App. at 609-11.

2

Docket Entry 5-8 at 27-30.)  In response, Petitioner filed a motion requesting the Court of Appeals to, <u>inter alia</u>, withdraw its opinion in <u>Baskins I</u>, stay the mandate, and issue an order finding the trial court's First Order on Remand a nullity as the trial court lacked jurisdiction.  (<u>See</u> <u>id.</u> at 31.)  The Court of Appeals issued an order ("COA Order") denying Petitioner's motion insofar as it requested withdrawal of <u>Baskins I</u> or a stay of the mandate, but vacating the trial court's First Order on Remand, finding that, because "the mandate in [<u>Baskins I</u>] d[id] not issue until 6 June 2016[,] . . . the trial court [wa]s without jurisdiction to take additional action."  (<u>Id.</u> at 32.)  In compliance with the COA Order, the trial court struck and declared void its First Order on Remand.  (<u>See</u> <u>id.</u> at 33.)

The trial court then held a new hearing on Petitioner's motion to suppress, which included additional witnesses and evidence (Docket Entry 5-19), and thereafter entered an "Order on Remand, Denying Motion to Suppress" ("Second Order on Remand") (Docket Entry 5-8 at 46-51).  The Court of Appeals affirmed, <u>State v. Baskins (Baskins II)</u>, No. COA16-1237, 254 N.C. App. 346 (table), 801 S.E. 2d 711 (table), 2017 WL 2945609 (N.C. App. July 5, 2017) (unpublished), and Petitioner did not file a petition for discretionary review in the North Carolina Supreme Court (<u>see</u> Docket Entry 1, ¶ 9(g)).

Petitioner subsequently filed both a pro se MAR (<u>see</u> Docket Entry 1, ¶ 12(Ground Two)(d), (Ground Three)(d), (Ground Four)(d); <u>see also</u> Docket Entry 5-12) and a separate, counseled MAR (<u>see</u>

3

Docket Entry 5-13) with the trial court. In light of Petitioner's counseled MAR (which raised a sole issue of ineffective assistance of trial counsel - a matter not raised in the instant Petition - and which, so far as the record reflects, remains pending), the trial court denied Petitioner's pro se MAR, finding that "[i]t [wa]s inappropriate to consider the *pro se* motion [Petitioner] filed when he has counsel representing his interests." (Docket Entry 5-14 at 2; <u>see also</u> Docket Entry 1, ¶ 12(Ground Two)(d)(2).) Petitioner then filed a pro se Petition for Writ of Certiorari with the North Carolina Court of Appeals seeking review of his pro se MAR's denial (<u>see</u> Docket Entry 1, ¶ 12(Ground Two)(d)(4)-(6), (Ground Three)(d)(4)-(6), (Ground Four)(d)(4)-(6); <u>see also</u> Docket Entry 5-15), which that court denied (<u>see</u> Docket Entry 1, ¶ 12(Ground Two)(d)(6)); <u>see also</u> Docket Entry 5-16), as well as Petitioner's subsequent Petition for Rehearing (<u>see</u> Docket Entry 5-17).

Petitioner next instituted this action via his Petition. (Docket Entry 1.) Thereafter, Respondent filed the instant Motion and Supporting Brief (Docket Entries 4, 5), and Petitioner responded in opposition (Docket Entry 7).

## II. Facts

On direct appeal, the North Carolina Court of Appeals summarized the trial evidence as follows:

> Greensboro Police Department Detective M.R. McPhatter ("Detective McPhatter") was working in a drug interdiction capacity on the morning of Monday, 6 October 2014 when he positioned himself near a Shell gas station with a convenience store ("the store") drop-off point for the China Bus Line. This line ran between Greensboro and

4

New York City and, in the past, Greensboro police had made arrests of people who had transported illegal narcotics on that bus line. Detective McPhatter was wearing plain clothes and waiting in an unmarked car when the bus arrived at the store between 6:00 a.m. and 6:30 a.m. on 6 October 2014. Detective McPhatter observed Gregory Charles Baskins ("Gregory") and Tamekia Bone ("Bone") exit the bus. At that time, Detective McPhatter was not familiar with either Gregory or Bone. Both Gregory and Bone were carrying "smaller bags. Just for like a weekend-type trip, change of clothes." Detective McPhatter watched Gregory and Bone enter the store, and then saw Gregory exit the store a couple of minutes later. After leaving the store, Detective McPhatter observed Gregory walking "backwards" in his direction, approach to about four parking spaces['] distance, and "gave a look inside my car as to see if he knew me or he was trying to . . . see who I was inside the vehicle. And then he kind of gave me a shoo-off type thing and then kind of walked back inside the store." At approximately the same time, Detective McPhatter observed a burgundy Buick ("the Buick") pull into the parking lot of the store. The driver of the Buick was later determined to be Gregory's brother, [Petitioner]. Gregory got into the front passenger side of the Buick and Bone got into the rear right seat. The Buick then left the store's parking lot with Gregory and Bone inside.

Detective McPhatter had taken down the license plate number for the Buick, and he input that information into his mobile terminal, which accessed the [DMV] data associated with that license plate number. According to Detective McPhatter's testimony, the Buick's "registration had . . . expired and it had an inspection violation also." Detective McPhatter relayed that information to other officers in the area because he wanted to stop the Buick in order to investigate possible drug trafficking activity. The information relating to the license plate of the Buick was obtained from DMV. Detective McPhatter did not want to stop the Buick himself because he did not want Gregory to recognize his vehicle as the same vehicle that had been waiting in the parking lot of the store.

Greensboro Police Department Detective M.P. O'Hal ("Detective O'Hal") was the officer who actually stopped the Buick on the morning of 6 October 2014. Detective O'Hal, who was part of the same drug interdiction squad as Detective McPhatter, had been alerted by Detective McPhatter concerning Gregory's actions at the store. Detective McPhatter had read the Buick's license plate

5

number over the radio, so Detective O'Hal was able to type that information into his mobile service computer and obtain information concerning the license plate from DMV. A printout of the DMV screen information relied upon by Detective O'Hal [("DMV Field Form")] was provided to Detective O'Hal during his testimony:

> [THE STATE:] Want to show you what I've marked as State's 1 and 2, couple of communications printouts, and just ask you about the information in each of these documents. You say when you initially ran the information through the [DMV], it reflected that the license itself was expired.

> [DET. O'HAL:] Yeah. The inspection was expired on it.

> [THE STATE:] Okay. And I want to ask about each of these. Let me begin with what I've marked as State's Exhibit Number 1 [the DMV Field Form]. If I may approach, Your Honor.

> THE COURT: Yes.

> [THE STATE:] Can you explain what this first document reflects?

> [DET. O'HAL:] This is what I saw on my -- I call it a visual MCT or my computer, which was with me that day of the stop. And it shows that the customer I.D.'s name or driver's license number, the name of the person that the vehicle is registered to, and it says "plate status expired." And it says that it was issued on 9-26-2013 and showed a status of being expired.

> [THE STATE:] And so in layman's terms . . . [the DMV Field Form] . . . reflect[s] the status of the plate and the inspection on the date in which it was stopped in State's 1.

> [DET. O'HAL:] Correct.

> . . .

> [THE STATE:] Okay. And that information reflected in [the DMV Field Form] . . . is the same information that was available to you on that particular day.

6

[DET. O'HAL:] Yes.

The [DMV Field Form], which was the same information Detective O'Hal relied upon to justify the stop of the Buick, contained the following two lines of information relevant to this appeal:

> PLT STATUS: EXPIRED
> ISSUE DT: 09262013 VALID THRU: 10152014

Th[e DMV Field Form] contained no information indicating the status of the Buick's inspection. As indicated in the information provided by DMV, the Buick's registration, though technically expired, was still valid on 6 October 2014, and would remain valid through 15 October 2014. This was because, according to N.C. Gen. Stat. § 20-66(9),

> [t]he registration of a vehicle that is renewed by means of a registration renewal sticker expires at midnight on the last day of the month designated on the sticker. It is lawful, however, to operate the vehicle on a highway until midnight on the fifteenth day of the month following the month in which the sticker expired.

N.C. Gen. Stat. § 20-66(9) (2015).

Detective O'Hal successfully initiated the stop, and approached [Petitioner], who was the driver of the Buick. Detective O'Hal informed [Petitioner] that he had been stopped due to an expired registration and an inspection violation, and asked [Petitioner] to produce his driver's license and registration. [Petitioner] informed Detective O'Hal that his license had been revoked. According to Detective O'Hal's testimony, while he was talking to [Petitioner], he noticed Gregory acting very nervous and sweating profusely. Detective O'Hal then noticed Gregory glance at Bone nervously, and Detective O'Hal noticed that Bone was also acting nervous. Detective O'Hal then asked if there were any weapons in the Buick, and [Petitioner] responded that there were not. Detective O'Hal asked [Petitioner] if he would consent to a search of the Buick, and [Petitioner] gave consent. [Petitioner], Gregory, and Bone all exited the Buick, and Detective O'Hal conducted a sniff search with his drug-trained canine ("K-9"). The K-9 alerted in both the front and rear right side passenger seats, indicating the possible recent presence of illegal narcotics. Based upon the alert of the K-9, and the behavior of Gregory and Bone, they, along with [Petitioner], were searched.

7

Approximately six ounces of what was later determined to be heroin was recovered from inside Bone's pants, and the suspects were arrested. [Petitioner] was indicted on 1 December 2014 for conspiracy to traffic in heroin, trafficking by possession of 28 grams or more of heroin, and trafficking by transportation of 28 grams or more of heroin.

Baskins I, 247 N.C. App. at 604-07.

### III.  Grounds for Relief

The Petition raises four grounds for habeas relief:

1) Petitioner's "[c]onviction [was] obtained pursuant to an unlawfull [sic] traffic stop" in violation of the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 19 of the North Carolina Constitution (Docket Entry 1, ¶ 12 (Ground One));

2) Petitioner's "[c]onviction was obtain [sic] by the state [sic] failure to make a show [sic] of probable cause supported by oath or affirmation to support magistrate [sic] order" (id., ¶ 12 (Ground Two));

3) Petitioner's "[c]onviction [was] obtained by the state's failure to make a showing of probable cause supported by oath or affirmation to support indictment" (id., ¶ 12 (Ground Three)); and

4) Petitioner's "[c]onviction [was] obtain [sic] by the state [sic] use of Grand Jury under Article 31 G.S. 15A-623(d) unconstitutionally provisioned without procedural due process safeguard [sic] to record and preserve witness testimony" (id., ¶ 12 (Ground Four)).

Case 1:19-cv-00839-WO-LPA   Document 8   Filed 08/06/20   Page 8 of 29

## IV. Habeas Standards

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Further, "[b]efore [the] [C]ourt may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to [this] [C]ourt in a habeas petition. The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").[3]

Additionally, this Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. To qualify

---

[3] The Court may deny a claim on the merits despite a lack of exhaustion. See 28 U.S.C. § 2254(b)(2).

as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407; <u>see also</u> <u>id.</u> at 409-11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous").

**V. Discussion**

**A.    Ground One**

In Ground One, Petitioner contends that his "[c]onviction [was] obtained pursuant to an unlawfull [sic] traffic stop" in violation of the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 19 of the North Carolina Constitution. (Docket Entry 1, ¶ 12 (Ground One).) More specifically, Petitioner asserts that the trial court's findings of fact numbers two, 10, and 12 in the Second Order on Remand qualify as "incorrect [] based on the expert testimony of DMV Lt. [Gary] Ollis at the July 6, 2016 hearing on remand." (<u>Id.</u> at 17, 19 (citing Docket Entry 5-19 at 40-41); <u>see also</u> Docket Entry 7 at 1-5.) Petitioner further argues that the trial court's findings of

Case 1:19-cv-00839-WO-LPA   Document 8   Filed 08/06/20   Page 10 of 29

fact numbers three, seven, and eight fail to comply with the COA Order's directive that the trial court "'take additional evidence to determine if Detective O'Hal had evidence from a source <u>other than the DMV Field Form</u>, <u>prior to the stop of the Buick</u>, that the Buick['s] inspection had lapsed.'" (Docket Entry 1 at 16-17 (emphasis added); <u>see also</u> Docket Entry 7 at 1-5.) Petitioner thus maintains that, "because Detective[s] O'Hal and McPhatter failed to obtain probable cause to justify the traffic stop based upon a registration violation, an inspection violation, or any other traffic violation as no traffic citation was ever issued, Detective O'Hal['s] search of [Petitioner's] vehicle and its occupants without a search warrant was inconsistent with the Fourth Amendment to the U.S. Constitution." (Docket Entry 7 at 4.) As a result, Petitioner insists that "the evidence derived from or gathered during Detective[s] O'Hal and McPhatter['s] illegal search of the vehicle and its occupants constituted fruit of the poisonous tree[] that was inadmissible under the exclusionary rule." (<u>Id.</u>) Those contentions fall short.

Ground One fails, because "Fourth Amendment claims generally cannot be considered on habeas review." <u>Salazar v. Jones</u>, No. 1:09CV859, 2010 WL 3895574, at *4 (M.D.N.C. Sept. 30, 2010) (unpublished) (citing <u>Wright v. West</u>, 505 U.S. 277, 293 (1992), <u>Stone v. Powell</u>, 428 U.S. 465, 481–82 (1976), <u>Mueller v. Angelone</u>, 181 F.3d 557, 570 n.8 (4th Cir. 1999), and <u>Grimsley v. Dodson</u>, 696 F.2d 303, 304 (4th Cir. 1982)). Here, "Petitioner certainly had a full and fair opportunity to contest [the officers' search of

11

Petitioner, his companions, and the vehicle in question as unlawful] at trial . . . .  Therefore, the Court cannot consider [Ground One] under the rule in <u>Stone</u>."  <u>Id.</u>

Even if not rendered non-cognizable by the rule in <u>Stone</u>, Ground One fails under a de novo review.[4]  Petitioner asserts that the trial court's findings of fact numbers two, 10, and 12 in the Second Order on Remand qualify as "incorrect [] based on the expert testimony of DMV Lt. Ollis at the July 6, 2016 hearing on remand." (Docket Entry 1 at 17, 19 (citing Docket Entry 5-19 at 40-41); <u>see also</u> Docket Entry 7 at 1-5.)  In particular, Petitioner maintains that findings two and 12, that Detectives McPhatter and O'Hal had the ability to see that the Buick's inspection had lapsed on their in-vehicle computers prior to the time of the stop (<u>see</u> Docket Entry 5-8 at 46, 47), conflict with the testimony of Lt. Ollis that

_____

[4] Although in Petitioner's direct appeal after remand, he challenged the trial court's findings in its Second Order on Remand, he did so based on different arguments then he now raises in Ground One.  (<u>Compare</u> Docket Entry 5-9 at 3 (arguing that "the trial court erred by finding as facts that the officers were able to see an inspection violation on the vehicle computer screens when <u>the state failed to produce any non-testimonial evidence</u> at the remand hearing to support the officers' testimony and the decision below found the lack of non-testimonial evidence rendered the state's case insufficient" (emphasis added)), <u>with</u> Docket Entry 1, ¶ 12(Ground One), <u>id.</u> at 11-21, <u>and</u> Docket Entry 7 at 1-5 (contending that trial court's findings 1) <u>conflicted with the testimony of Lt. Ollis</u>, and 2) did not comply with the COA Order's directive that trial court determine whether Detective O'Hal had evidence <u>from sources other than the DMV Field Form</u> and <u>prior to the stop of the Buick</u> that the Buick's inspection had lapsed).)  Moreover, Petitioner neither raised the substance of Ground One in his pro se MAR (<u>see</u> Docket Entry 5-12) nor his counseled MAR (<u>see</u> Docket Entry 5-13).  Accordingly, although not argued by Respondent (<u>see</u> Docket Entry 5 at 4-6), Petitioner has failed to exhaust the substance of Ground One in state court.  Respondent's mere failure to argue exhaustion with regard to Ground One does not amount to waiver of the exhaustion requirement, <u>see</u> 28 U.S.C. § 2254(b)(3) (providing that "[a s]tate shall not be deemed to have waived the exhaustion requirement . . . unless the [s]tate, through counsel, expressly waives the requirement"), and the Court may deny a claim on the merits despite a lack of exhaustion, <u>see</u> 28 U.S.C. § 2254(b)(2).  Moreover, because Petitioner has not exhausted the substance of Ground One in state court, no state court determination on the merits of the substance of Ground One exists to which this Court must defer under 28 U.S.C. § 2254(d) and (e)(1).

Detective O'Hal could not have seen the information reflected in State's Exhibits Two, Three, and Four (see Docket Entry 5-8 at 41-45) on his in-vehicle computer (see Docket Entry 1 at 17-19 (citing Docket Entry 5-19 at 40-41)). With regard to finding number 10 that Lt. Ollis confirmed that Detectives McPhatter and O'Hal could have seen the Buick's lapsed inspection in the database they accessed prior to the stop (see Docket Entry 5-8 at 47), Petitioner argues that this finding contradicts Lt. Ollis's testimony that the DMV License and Theft Bureau bears the responsibility of maintaining vehicle inspection data, and that only the DMV may access that data (Docket Entry 1 at 19-21 (citing Docket Entry 5-19 at 31-33)).

Petitioner's reliance on Lt. Ollis's testimony that Detective O'Hal could not have seen the information reflected in State's Exhibits Two, Three, and Four (see Docket Entry 5-8 at 41-45) on his in-vehicle computer to attack findings two and 12 (see Docket Entry 1 at 17-19 (citing Docket Entry 5-19 at 40-41)) misses the mark. Lt. Ollis acknowledged that he created those documents after the fact of the stop as part of his investigation into the inspection history of the Buick. (See Docket Entry 5-19 at 29-31, 34-36, 40-41.) In particular, Lt. Ollis utilized State's Exhibits Two, Three and Four to confirm the Buick's last inspection date as the end of August 2013, as the following testimony shows:

> [State's Attorney:] [Y]ou've had occasion to hear Detective O'Hal from the witness stand; is that right?
>
> [Lt. Ollis:] Yes, sir.

13

[State's Attorney:] When he testified that he stopped this particular vehicle and he made various checks on his mobile computer, he was able to determine that there was an expired registration plate and an inspection violation. And specifically that vehicle was last inspected in what would have been August of 2013. Can you tell me, based upon your research of this vehicle, whether or not that is consistent with your understanding of the inspection history for this vehicle?

[Lt. Ollis:] Yes. That is accurate.

. . .

[State's Attorney:] And in this particular instance, when he indicated that it was last inspected, at least based upon his review of the information provided to him[,] on August 31, 2013; is that consistent with the documents that had been presented by yourself and introduced into evidence?

[Lt. Ollis:] Consistent, yes. There's a one-day discrepancy.

[State's Attorney:] Can you explain that to me?

[Lt. Ollis:] The DMV, in laymen's terms, gives the customer or citizen the benefit of a doubt. And regardless of what day of the month you have your vehicle inspected, they always give you credit to the last day of that month. So this vehicle, in historical records, shows that it was inspected August 30th. But when the officer ran the plate, they were shown August 31st which is consistent for all viewers.

[State's Attorney:] [B]ased on your research of the vehicle itself and the documents connected with the records of the [DMV], is it your determination that this vehicle, in fact, had an expired inspection at the time it was stopped, on October 6th? Is that right?

[Lt. Ollis:] That is correct. It was expired.

[State's Attorney:] . . . [T]here's a grace period incorporated with an expired plate; is that correct?

[Lt. Ollis:] That's correct.

[State's Attorney:] If this plate expired at the end of what would have been September . . . it is technically valid for another 15 days following; is that correct?

14

[Lt. Ollis:] That is correct.

[State's Attorney:] So, technically speaking, while expired, until October 15, 2014, it would have been proper to continue to operate the vehicle?

[Lt. Ollis:] That is correct. As far as registration is concerned.

[State's Attorney:] . . . How about the inspection?

[Lt. Ollis:] The inspection expires the last day of the month that the plate is actually valid through. So, in this particular case, <u>the inspection expired on September 30th, 2014. And there's no grace period for the inspection</u>. In fact, the state allows you to have your vehicle inspected up to 90 days before the tag expires so that you're given ample time to renew your registration before the 15-day grace period expires.

[State's Attorney:] And with respect to that explanation, Lieutenant, had the registered owner for this vehicle had this vehicle inspected any time within the 90-day period prior to the expiration of the plate, the records that have been introduced into evidence [State's Exhibits 2, 3, and 4] would they have reflected that?

[Lt. Ollis:] Yes, sir. They would have shown the exact date that the vehicle was inspected.

[State's Attorney:] And because they do not, and because they did not, then again <u>the records reveal that this inspection was not renewed prior to a vehicle being stopped</u>?

[Lt. Ollis:] <u>That is correct</u>.

(<u>Id.</u> at 36-40 (emphasis added).)

Even more significantly, Petitioner glosses over the fact that Lt. Ollis testified that 1) the Detectives could have seen the information on the DMV Field Form (State's Exhibit One) on their in-vehicle computers, and 2) that such information included the <u>inspection status</u> of the Buick:

[State's Attorney:] . . . <u>When [Det. O'Hal] described that he was viewing a screen from his mobile computer,</u>

15

> are you acquainted with the information that is provided
> once a plate registration is placed into the computer?
>
> [Lt. Ollis:] Yes, sir.
>
> [State's Attorney:] And might that include the status of
> the registration plate in [sic] the inspection history?
>
> [Lt. Ollis:] Yes, sir.

(Id. at 37 (emphasis added).)[5]

Petitioner's citation to Lt. Ollis's testimony that the DMV License and Theft Bureau bears the responsibility of maintaining vehicle inspection data, and that only the DMV may access that data (Docket Entry 1 at 19-21 (citing Docket Entry 5-19 at 31-33)) to challenge finding number 10 (that Lt. Ollis confirmed that Detectives could have seen the Buick's lapsed inspection on their in-vehicle computers (see Docket Entry 5-8 at 47)) fares no better. As the testimony quoted above makes clear, Lt. Ollis unambiguously stated that the Detectives could access DMV data such as registration and inspection status from their in-vehicle computers. (See Docket Entry 5-19 at 37.)

Petitioner further attacks the trial court's findings seven and eight that Lt. Ollis confirmed the Buick's last inspection date as August 31, 2013, and confirmed that the Buick's inspection had lapsed prior to the stop (see Docket Entry 5-8 at 46-47), as based on matters occurring after the stop, contrary to the COA Order's mandate that the trial court determine if Detective O'Hal had information regarding the Buick's inspection status from a source

---

[5] The final question above likely should read, "And might that include the status of the registration plate and the inspection history." (Docket Entry 5-8 at 37 (emphasis added).)

16

"'prior to the stop.'" (Docket Entry 1 at 16 (emphasis added) (quoting Docket Entry 5-8 at 31); see also Docket Entry 7 at 1-5.) However, Petitioner again conflates Lt. Ollis's testimony regarding documents he generated during his investigation to confirm the Buick's last inspection date with his testimony regarding the information that Detectives McPhatter and O'Hal could see on their in-vehicle computers. As quoted above, Lt. Ollis agreed that the Detectives could access the Buick's registration and inspection status from their in-vehicle computers prior to the stop. (See Docket Entry 5-19 at 37.)

Petitioner additionally maintains that the trial court's finding number three, that the information regarding the Buick's inspection status "was at the bottom of a scroll down screen" (Docket Entry 5-8 at 46), violates the COA Order's dictate that the trial court "'take additional evidence from some source other than the DMV Field Form . . . that the Buick's inspection had lapsed.'" (Docket Entry 1 at 16-17 (emphasis added) (quoting Docket Entry 5-8 at 31).) Contrary to Petitioner's allegations, Detective O'Hal's testimony, upon which finding number three depends, complied with the COA Order:

> [Det. O'Hal:] [W]e have our mobile database which is hooked up to the [DMV]. And when you place the tag in there, it will give you the registered owner's name, address, and the status of the registration of the vehicle, the status of the insurance of the vehicle, if it's active insurance or non[-]active, and also show you the inspection of the vehicle, as well.
>
> [State's Attorney:] And this is all reflected on a single screen, or a scroll-down screen?
>
> [Det. O'Hal:] It's a scroll-down screen, sir.

17

. . .

[State's Attorney:] [Y]ou noted an inspection violation?

[Det. O'Hal:] Yes, sir.  The very bottom part of that scroll-down screen it will show that in addition to the expired registration tag, it will show in almost an asterisk inspection violation as well.  And then it said, it also gave that as "last inspected on 08/31/2013."

[State's Attorney]: And for purpose of clarification, is this the same information incidentally, the expired registration plate, coupled with the expired inspection that Corporal McPhatter shared with you?

[Det. O'Hal:] Yes, sir.

[State's Attorney:] This based on his own independent review of the same DMV file?

[Det. O'Hal:] That's correct.

[State's Attorney]: By way of further explanation when you indicated that in your report, in a parenthetical, it was last inspected 08/31/2013?

[Det. O'Hal:] Yes.

[State's Attorney:] This is the same . . . information that was provided again in part based upon the tag?

[Det. O'Hal:] That's correct.  When you ran that tag on that day, that is the results that came back on our screen.

[State's attorney:] And so, just in laymen's terms then, what that reflected for you is not only that the tag itself was expired, whether or not within some grace period, but there was an inspection violation.  And, in addition to that, the DMV shared with you, through this record, the last time this particular vehicle was inspected?

[Det. O'Hal:] That's correct.

[State's attorney:] It was more than a year before this, and specifically . . . on or about 08/31/2013?

[Det. O'Hal]: Yes, it specifically said, "Last inspected on  08/31/2013."

. . .

18

[State's Attorney:] Now, <u>is there any information on th[e DMV Field Form] that was run at or about the same time that th[e first] hearing [on Petitioner's motion to suppress] was being conducted concerning the inspection violation</u> or the alleged inspection violation?

[Det. O'Hal:] <u>No, sir</u>. This is what we ran. Just the tag.

[State's Attorney:] Now, I want to make sure that I'm clear. <u>Taking a look at [the DMV Field Form]. Is this the extent of any information that was made available to you back on the date in which the stop took place, back on October 6, 2014?</u>

[Det. O'Hal:] <u>There was additional information on the actual stop, and we had an actual stop [sic] that is not on this document here</u>.

[State's Attorney:] <u>So on your mobile terminal, in addition to what is reflected on that document, more information concerning a status of the vehicle that this tag belongs to</u>?

[Det. O'Hal:] <u>That's correct</u>.

[State's Attorney:] <u>Did that information include the last inspection</u>?

[Det. O'Hal:] <u>Yes, sir</u>. Underneath this -- this is obviously the correct format and the correct spacing, etc., but <u>underneath, when we looked at the document that day, there should have been an asterisk right here, and then it would say, "Last inspected on 08/31/2013," and then an asterisk at the bottom</u>.

[State's Attorney:] And <u>also reflected then on your computer screen  the status of the vehicle's inspection, that being that it had expired</u>?

[Det. O'Hal:] <u>Yes</u>.

[State's Attorney:] And <u>it reflects then the date 08/31/2013</u>?

[Det. O'Hal:] <u>Yes</u>.

(Docket Entry 5-19 at 14-19 (emphasis added).)  Thus, Detective O'Hal's testimony makes clear that, once he inputted the Buick's license plate into his in-vehicle computer, the computer's scroll-

19

down screen contained inspection data not apparent on the DMV Field Form, i.e., he obtained information regarding the Buick's inspection status from a source <u>other than the DMV Field Form</u>.

As Petitioner has not demonstrated the incorrectness of any of the trial court's findings of fact, he has not undermined the trial court's ultimate finding that probable cause existed for the stop "based on [Petitioner]'s violation of [North Carolina's] inspection law" (Docket Entry 5-8 at 47) and thus Petitioner has not shown that the subsequent search of the Buick and its occupants violated his rights under the Fourth Amendment of the U.S. Constitution.

In sum, Ground One fails as non-cognizable under the rule in <u>Stone</u> and additionally on the merits.

**B.   Ground Two**

Next, Petitioner argues that his "[c]onviction was obtain [sic] by the state [sic] failure to make a show [sic] of probable cause supported by oath or affirmation to support magistrate [sic] order." (Docket Entry 1, ¶ 12 (Ground Two).)  According to Petitioner, Detective McPhatter "appeard [sic] before [a] magistrate [] for a magistrate order to justify the arrest and detention of [P]etitioner after a traffic stop," and "failed to make a showing of probable case supported by his oath or affirmation by affidavit." (<u>Id.</u> at 22.)  In that regard, Petitioner maintains that he wrote "to the Guilford County Clerk of Court to produce the affidavit supporting the issue of [the] magistrate's order [in case] 14CRS088608 as direct evidence of a showing of probable cause supported by oath or affirmation to

20

justify the arrest and detention of [P]etitioner," but that the Clerk of Court responded that "no affidavit [existed] with the magistrate['s] order." (Id.)[6] Petitioner contends that "the arrest and detention of petitioner by magistrate order 14 CRS 88608 without a showing of probable cause supported by oath or affirmation inconsistant [sic] with the Fourth Amendment prohibition against unreasonable searches and seizures." (Id.)

As with Ground One, Ground Two falters on the basis of the rule in Stone. See Salazar, 2010 WL 3895574, at *4 ("Fourth Amendment claims generally cannot be considered on habeas review.") (citing Wright, 505 U.S. at 293, Stone, 428 U.S. at 481–82, Mueller, 181 F.3d at 570 n.8, and Grimsley, 696 F.2d at 304). Here, "Petitioner certainly had a full and fair opportunity to contest [the magistrate's issuance of the arrest warrant in case 14 CRS 088608 as unlawful] at trial . . . . Therefore, the Court cannot consider [Ground Two] under the rule in Stone." Id.

Moreover, even if not rendered non-cognizable by Stone, Ground Two fails on its merits. Indeed, the Magistrate's Order itself belies Petitioner's argument:

> <u>Petitioner's detention is justified because there is probable cause to believe that</u> on or about the date of offense shown and in the county named above [<u>Petitioner</u>] <u>unlawfully, willfully, and feloniously did conspire with Gregory Baskins, and Tomekia Antoinette Bone to commit the felony of trafficking by transportation and possession of 28 grams or more of heroin.</u>

---

[6] The record lacks copies of Petitioner's alleged written communication to the Guilford County Clerk of Court and the Clerk's alleged response.

Case 1:19-cv-00839-WO-LPA   Document 8   Filed 08/06/20   Page 21 of 29

. . . . This Magistrate's Order is issued upon information furnished <u>under oath</u> by the arresting officer(s) shown [Detective McPhatter].

(Docket Entry 5-8 at 5 (emphasis added).)   Furthermore, as the United States Court of Appeals for the Fourth Circuit has recognized, the Fourth Amendment does not require that the information given by Detective McPhatter under oath or affirmation must appear in an affidavit or other form of writing:

> The Fourth Amendment does not require that the basis for probable cause be established in a written affidavit; it merely requires that the information provided the issuing magistrate be supported by "Oath or affirmation." U.S. Const. amend. IV.   Moreover, the Amendment does not "require that statements made under oath in support of probable cause be tape-recorded or otherwise placed on the record or made part of the affidavit."   It follows that magistrates may consider sworn, unrecorded oral testimony in making probable cause determinations during warrant proceedings[.]

<u>United States v. Clyburn</u>, 24 F.3d 613, 617 (4th Cir. 1994) (internal citation omitted) (quoting <u>United States v. Shields</u>, 978 F.2d 943, 946 (6th Cir.1992)).

In light of the foregoing analysis, the Court should deny Ground Two as non-cognizable under the rule in <u>Stone</u> and meritless.

## C.   **Ground Three**

Via Ground Three, Petitioner contends that his "[c]onviction [was] obtained by the state's failure to make a showing of probable cause supported by oath or affirmation to support indictment." (Docket Entry 1, ¶ 12 (Ground Three).)   According to Petitioner, "Detective McPhatter failed to make a showing of probable cause supported by his oath or affirmation to support the return of true bill of indictment from the grand jury." (<u>Id.</u> at 24.)   Petitioner

22

additionally appears to argue that, because the grand jury that indicted him did not constitute an "investigative grand jury" under N.C. Gen. Stat. § 15A-623(h), but rather one impaneled under Section 15A-623(d) which lacked "procedural due process safeguard [sic] to record and preserve grand jury witness testimony" (Docket Entry 7 at 6), his indictment violated the Fourteenth Amendment's guarantees of equal protection of the laws and due process (id. at 5-8.)

As an initial matter, Respondent counters that Ground Three faces a procedural bar, because Petitioner neither raised the substance of Ground Three on direct appeal nor in his counseled MAR. (See Docket Entry 5 at 8-10.)  That argument glosses over the fact that Petitioner did fairly present the substance of Ground Three in his pro se MAR (see Docket Entry 5-12 at 5), and filed a certiorari petition in the Court of Appeals seeking review of that MAR's denial (see Docket Entry 5-15).  The Fourth Circuit has rejected the argument that a petitioner who presents pro se claims in a filing supplemental to a counseled filing fails to exhaust those claims:

> The district court concluded that because South Carolina law forbids a [post-conviction petitioner] who is represented by counsel from filing supplemental pro se pleadings in the South Carolina Supreme Court, [the petitioner] had failed to exhaust the claim.  The court further reasoned that [the petitioner] would be procedurally barred from presenting the claim in a subsequent [post-conviction] application, and thus that the claim was defaulted.  This holding is incorrect.  A petitioner exhausts state remedies by fairly presenting his constitutional claim to the state courts.  See Mallory v. Smith, 27 F.3d 991, 994 (4th Cir. 1994).  And, the fact that the state court does not rule on the merits of a claim does not mean that it is unexhausted.  See

23

> Smith v. Digmon, 434 U.S. 332, 333 (1978) (per curiam)
> (holding that exhaustion does not turn on whether the
> state court considers the merits of a claim that has been
> fairly presented to it). Because [the petitioner]
> presented his claim that trial counsel were
> constitutionally ineffective to the South Carolina
> Supreme Court, the claim has been exhausted and may be
> treated as defaulted only if the state court actually
> relied on a state procedural rule in denying relief. See
> Harris[ v. Reed], 489 U.S. [255,] 262-63 [(1989)].

Atkins v. Moore, No. 97-17, 139 F.3d 887 (table), 1998 WL 93409, at
*4 n.6 (4th Cir. Mar. 5, 1998) (unpublished) (internal parallel
citation omitted); see also Holloway v. Horn, 355 F.3d 707, 715-16
(3d Cir. 2004) (concluding that pro se brief, supplemental to brief
filed by counsel, fairly presented claim to state court); Clemmons
v. Delo, 124 F.3d 944, 948-49 (8th Cir. 1997) (deeming the
petitioner's attempt to file supplemental pro se brief with state
supreme court sufficient to fairly present Brady claim to state
courts); Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997) (holding
that "[a] petitioner may satisfy the exhaustion requirement by
presenting his federal claim in a pro se supplemental brief, even
if he has an attorney"); McBride v. Estelle, 507 F.2d 903, 904 (5th
Cir. 1975) (per curiam) (stating that the petitioner's filing of
supplemental pro se brief in addition to opening brief filed by
counsel satisfied § 2254's "presentation" requirement). Thus,
Petitioner has fairly presented, and therefore exhausted, the
substance of Ground Three in state court.

Even if Petitioner has exhausted the substance of Ground Three
in the state courts, this Court may not consider it if a state
court has declined to consider its merits on the basis of "an
adequate and independent state procedural rule." Harris, 489 U.S.

24

at 262. Such a rule qualifies as "adequate" if the state courts regularly or consistently apply the rule, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and qualifies as "independent" if the rule does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985). Here, however, the trial court did not cite to any rule in declining to consider Petitioner's pro se MAR, stating only that "[i]t [wa]s inappropriate to consider the *pro se* motion [Petitioner] filed when he has counsel representing his interests." (Docket Entry 5-14 at 2.)[7] Under these circumstances, the Court should not find that procedural default bars Ground Three. See Clemmons, 124 F.3d at 948 n.3 ("No rule of court or reported Missouri case of which we are aware specifies the circumstances under which Missouri appellate courts allow pro se briefs. A state procedural rule must be regularly adhered to if it is to be an adequate state ground supporting a procedural bar. Sometimes Missouri courts allow pro se briefs, and sometimes they do not. That is their prerogative. But in the absence of regularly applied criteria, the decision not to allow such a brief cannot be said to rest on a regularly applied rule of state procedural law." (internal citation omitted)).

Although not procedurally barred, Ground Three fails on its merits for three reasons. First, Petitioner's claim that the

---

[7] The North Carolina Court of Appeals also did not indicate that it denied Petitioner's certiorari petition seeking review of his pro se MAR's denial on the basis of procedural default and/or an adequate and independent state procedural rule. (See Docket Entry 5-16.)

Case 1:19-cv-00839-WO-LPA   Document 8   Filed 08/06/20   Page 25 of 29

format of the grand jury that indicted him, i.e., one impaneled under N.C. Gen. Stat. § 15A-623(d) rather than § 15A-623(h) and thus not involving recordation/transcription of witness testimony, violated his equal protection and due process rights remains non-cognizable on federal habeas review. "'[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.' Preiser v. Rodriguez, 411 U.S. 475, 484 (1973). . . . [C]orrecting such error would have no impact on the legality of [the petitioner]'s sentence. Claims of the denial of due process in collateral proceedings [such as grand jury proceedings] are simply not cognizable in federal habeas corpus cases." Morton v. Crews, No. CIV.A. 10-148, 2012 WL 1410252, at *14 (E.D. Ky. Mar. 27, 2012) (unpublished), recommendation adopted, 2012 WL 1410186 (E.D. Ky. Apr. 23, 2012) (unpublished).

Second, even if Petitioner had attempted to argue that the unrecorded format of the grand jury proceedings against him somehow impeded or precluded a sufficient showing of probable cause to indict him, such a claim would fail, as "the right to be properly indicted by a grand jury is not a right that the [United States] Supreme Court has made applicable to defendants facing state criminal proceedings." Jones v. Shanahan, No. 1:12CV304, 2014 WL 991892, at *4 (W.D.N.C. Mar. 13, 2014) (unpublished) (citing Hurtado v. California, 110 U.S. 516, 534-35 (1884), and Albright v. Oliver, 510 U.S. 266, 272–73 (1994)). Moreover, the United States

Supreme Court has held that guilty verdicts at trial render harmless "any conceivable error" in the grand jury's proceedings, United States v. Mechanik, 475 U.S. 66, 73 (1986), because "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt," id. at 72; see also id. (explaining that "the societal costs of retrial after a jury verdict of guilty are far too substantial to justify setting aside the verdict simply because of an error in the earlier grand jury proceedings").

Third, Petitioner did not attend (and by law could not attend, see N.C. Gen. Stat. § 15A-623(d) (listing persons permitted to attend grand jury proceedings)) the grand jury proceedings against him and thus lacks personal knowledge whether 1) Detective McPhatter provided information to the grand jury under oath or affirmation, and 2) that information provided probable cause to indict Petitioner on the three charges in question. As a result, Petitioner has not shown that "Detective McPhatter failed to make a showing of probable cause supported by his oath or affirmation to support the return of true bill of indictment from the grand jury" (Docket Entry 1 at 24).

In sum, Ground Three fails as a matter of law.

D.  **Ground Four**

In Ground Four, Petitioner argues that his "[c]onviction [was] obtain [sic] by the state [sic] use of Grand Jury under Article 31 G.S. 15A-623(d) unconstitutionally provisioned without procedural

27

due process safeguard [sic] to record and preserve witness testimony." (Docket Entry 1, ¶ 12(Ground Four).) More specifically, Petitioner reiterates his contentions from Ground Three that, because the grand jury that indicted him did not constitute an "investigative grand jury" under N.C. Gen. Stat. § 15A-623(h), but rather one impaneled under Section 15A-623(d) which lacked "procedural due process safeguard [sic] to record and preserve Detective McPhatter's grand jury witness testimony and oath or affirmation as evidence of the state's showing of probable cause . . . to support the return of true bill of indictment against [P]etitioner" (id. at 27-28), his indictment "permanently denied his fundamental constitutional right to unreasonable search and seizure, an impartial jury, confrontation cruel and unusual punishment, involuntary servitude, privileges and immunities, due process of law, and equal protection of laws" (id. at 28; see also Docket Entry 7 at 8-9.)

As a threshold matter, because Petitioner raised the substance of Ground Four in his pro se MAR (see Docket Entry 5-12 at 6-7), for the reasons provided in connection with Ground Three, Ground Four does not face a procedural bar. See Atkins, 1998 WL 93409, at *4 n.6. However, Ground Four merely repackages the allegations contained in Ground Three and therefore fails on its merits for the same reasons provided in the discussion of Ground Three.

## VI. Conclusion

Petitioner's claims provide no basis for collateral relief.

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 4) be granted, that the Petition (Docket Entry 1) be denied, and that Judgment be entered dismissing this action without issuance of a certificate of appealability.


              /s/ L. Patrick Auld
              **L. Patrick Auld**
      **United States Magistrate Judge**


August 6, 2020